**ABUNDANCE PARTNERS LP, Plaintiff,**

v.

**QUAMTEL, INC. and Syncpointe, Inc., f/k/a Syncpoint, LLC, Defendants.**

**No. 11 Civ. 5841(CM).**

United States District Court, S.D. New York.

Jan. 5, 2012.

---

Holly R. Froum, Ellenoff Grossman & Schole, LLP, Jordan Danforth Wolff, Ellenoff Grossman & Schole LLP, New York, NY, for Plaintiff.

Alan Avery Heller, Heller, Horowitz & Feit, P.C., New York, NY, for Defendant.

**DECISION AND ORDER GRANTING IN PART AND DENYING IN PART QUAMTEL'S MOTION FOR SUMMARY JUDGEMENT AND DENYING PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT**

McMAHON, District Judge.

On August 19, 2011, Plaintiff Abundance Partners LP ("Plaintiff") commenced this action against Defendants Quamtel, Inc. ("Quamtel") and Syncpointe, Inc. ("Syncpointe") (collectively, "Defendants"), Plaintiff asserts three causes of action—two for breach of contract and one for conversion—against Defendants arising out of

two agreements between the parties concerning a loan.

Rather than filing a motion to dismiss or proceeding to discovery, Quamtel opted to file an early motion for summary judgment on October 7, 2011. On November 10, 2011, Plaintiff cross-moved for summary judgment. Plaintiff has not moved for summary judgment against Syncpointe.

For the reasons discussed below, Quamtel's motion for summary judgment is GRANTED in part and DENIED in part, and Plaintiff's motion for summary judgment is DENIED.

## I. Background

The undisputed facts relevant to the motions before the Court are taken from the parties' Rule 56.1 statements, affidavits, and exhibits.

### A. The Parties

Plaintiff, a Delaware limited partnership, is a privately offered pooled investment vehicle. (Efros Aff. in Supp. of Pl.'s Cross–Mot. for Summ. J. ("Efros Aff.") ¶ 1.)

Defendant Quamtel is a Nevada Corporation with its principal place of business in Dallas, Texas. (Quamtel and Pl.'s 56.1 Statements ¶ 1.) Quamtel provides prepaid and postpaid "enhanced" telecommunications services, including international prepaid calling services. (Ehrlich Aff. in Supp. of Def.'s Mot. for Summ. J. ("Ehrlich Aff.") ¶ 1.)

Defendant Syncpointe is a Texas corporation—formerly known as Syncpointe LLC—with its principal place of business in Dallas, Texas. (Quamtel and Pl.'s 56.1 Statements ¶ 2.) Syncpointe was a software developer focused on the development of mobile device management software. (Ehrlich Aff. ¶ 6.)

### B. The Original Loan Agreement Between Syncpointe and Plaintiff

On June 3, 2010, Syncpointe and Plaintiff entered into a Loan and Security Agreement (the "Loan Agreement"), pursuant to which Plaintiff loaned Syncpointe $100,000 (the "Loan"). (Efros Aff. Ex. B ("Loan Agreement") ¶ 1; Quamtel and Pl.'s 56.1 Statements ¶ 3.) Section 3 of the Loan Agreement obligated Syncpointe to repay the $100,000, as well as interest at the rate of 6% per annum. The parties agreed that the entirety of the principal amount of the Loan (the $100,000) plus all accrued interest would be due on October 1,2010. (Loan Agreement ¶ 3.)

Syncpointe secured the Loan with its collateral, defined in Section 4—titled "Security Interest"—as, among other things:

> the following property now owned or at any time hereafter acquired by the Borrower [*i.e.*, Syncpointe] or in which the Borrower now has or at any time in the future may acquire any right, title or interest (collectively, the *"Collateral"*): (i) all Accounts, including each and every Account Receivable; (ii) all Goods; (iii) all Inventory; (iv) all Equipment; (v) all Documents; (vi) all instruments; (vii) all Chattel Paper; (viii) all cash and cash equivalents; (ix) all Deposit Accounts; (x) all securities accounts, together with all financial assets held therein or credited thereto; (xi) all Investment Property; (xii) all Fixtures; (xiii) all General Intangibles, including all Contract Rights....

(Loan Agreement ¶ 4(a) (emphases in original).) Syncpointe also pledged its intellectual property—which included all Syncpointe's source code, software, all enhancements, and associated documentation (the "Source Code")—to secure the Loan under Section 4.

Section 5(a) of the Loan Agreement states that Syncpointe will be in default of the Loan Agreement where:

(i) [Syncpointe] fails in the payment when due of the Principal Amount and all interest, fees, expenses or other amounts due hereunder;

(ii) [Syncpointe] shall default in the due performance and observance of any covenant or obligation under this Agreement;

(iii) The [sic] shall be a breach of any representation and warranty contained herein;

(iv) Any judgment or order for the payment of money shall be rendered against [Syncpointe] in excess of $10,000;

(v) [Syncpointe] causes, permits or suffers to exist the involuntary commencement of, or voluntarily commences any bankruptcy, reorganization, debt arrangement, or other case or proceeding under any bankruptcy or insolvency laws, or permits or suffers to exist the involuntary commencement of, or voluntarily commences any dissolution, winding up or liquidation proceeding.

(Loan Agreement ¶ 5(a).) Relevant here, Syncpointe was obligated to place the Source Code in escrow with a designated escrow agent within 30 days after June 3, 2010. (*Id.* ¶ 6(a); Quamtel and Pl.'s 56.1 Statements ¶ 4.)

Section 5(b) of the Loan Agreement provided Plaintiff with contractual remedies in the event of a default. Specifically, Plaintiff would have the rights to:

(i) declare the Principal Amount [$100,-000] and all accrued interest thereon, immediately due and payable without presentment, demand or notice of any kind and/or

(ii) reduce any claim to judgment and/or . . .

(iii) (A) take and practice or sell [Syncpointe's] Intellectual Property and take and use or sell the Intellectual Property and the good will of [Syncpointe's] business symbolized by the Intellectual Property (including trademarks) and the right to carry on the business and use the assets of [Syncpointe] in connection with which the Intellectual Property and related trademarks have been used . . .

(iii) (B) exercise all rights and remedies of a secured party under the [New York Uniform Commercial Code]. Without limiting the generality of the foregoing, [Plaintiff], without demand of performance or other demand, presentment, protest, advertisement or notice of any kind (except any notice required by law referred to below) to or upon [Syncpointe] or any other Person (all and each of which demands, defenses, advertisements and notices are hereby waived), may in such circumstances forthwith collect, receive, appropriate and realize upon the Collateral, or any part thereof, and/or may forthwith sell, lease, assign, give option or options to purchase, or otherwise dispose of and deliver the Collateral or any part thereof (or contract to do any of the foregoing). . . .

(Loan Agreement ¶ 5(b).) Furthermore, Syncpointe would remain liable "for any deficiency if the proceeds of any sale or other disposition of the Collateral are insufficient" to pay the Amount Outstanding and costs associated with collecting such deficiency. (*Id.*)

Elsewhere, the Loan Agreement provides that, upon default, the interest rate on the Loan would increase from 6% to 18%, (*id.* ¶ 3), and that the escrow agent "shall release to [Plaintiff] all deposited source code and title thereto," (*id.* 16(b)). Syncpointe would also owe Plaintiff an "Event of Default" fee of $25,000 in additional to any and all other amounts owed. (*Id.* ¶ 5(d).)

In sum, upon default, (1) Syncpointe would be immediately liable to Plaintiff for the full value of the principal amount and accrued interest (collectively, the "Amount

Outstanding"),[1] (2) the interest rate on the Loan would increase from six percent to eighteen percent, (3) Plaintiff would obtain possession of and title to the Source Code, and (4) Plaintiff would have the right to immediately proceed—without demand—against Syncpointe's collateral. If the proceeds from the sale of Syncpointe's collateral were insufficient to repay the Amount Outstanding, "the Borrower" would remain liable for any deficiency. (*Id.* ¶ 5(b).)

### C. Syncpointe Defaults on the Loan Agreement

On July 3, 2010, Syncpointe defaulted by failing to place the Source Code into escrow in accordance with Section 6(a) of the Loan Agreement. (Quamtel and Pl.'s 56.1 Statements ¶ 15.) Due to that default, the Amount Outstanding became due immediately and the interest rate increased to eighteen percent, accruing from July 3, 2010. (*Id.*)

### D. Quamtel Acquires Syncpointe

On August 18, 2010, Quamtel acquired Syncpointe by purchasing one hundred percent of Syncpointe LLC's outstanding membership interests, pursuant to the terms of the Membership Interest Purchase Agreement (the "Purchase Agreement"). (Ehrlich Aff. Ex. B ("Purchase Agreement"); Quamtel and Pl.'s 56.1 Statements ¶ 16.) Quamtel alleges that it reorganized Syncpointe as a subsidiary corporation (Quamtel and Pl.'s 56.1 Statements ¶ 16; Purchase Agreement ¶ 1.4); whether or not this reorganization occurred as Quamtel claims is a subject of dispute, but that is of no relevance to the motion before the Court.

In exchange for the membership shares, Quamtel gave Syncpointe's sellers 1,000,000 shares of restricted stock in Quamtel, as well as twelve and one half percent of Syncpointe's net profits from August 18, 2010 to February 18, 2012. (Quamtel and Pl.'s 56.1 Statements ¶ 17; Purchase Agreement ¶ 1.4.) The latter guarantee was not worth the paper it was written on: Syncpointe generated no revenue in 2010 and 2011. (Ehrlich Aff. ¶ 7; Efros Aff. ¶ 16.)

On October 1, 2010, Quamtel paid $10,000 towards the Amount Outstanding and another $10,000 on October 22. (Quamtel and Pl.'s 56.1 Statements ¶¶ 18–19.)

### E. Quamtel, Syncpointe, and Plaintiff Amend the Loan Agreement

On November 4, 2010, Quamtel, Syncpointe, and Plaintiff entered into an agreement amending the original Loan Agreement (the "Amended Agreement") (collectively, the "Agreements"), (Efros Aff. Ex. C ("Am. Agreement").) The Amended Agreement is a short two page document, and contains 10 sections—seven of which are relevant to these motions.

Section 1 of the Amended Agreement required "Borrower"—defined in the Amended Agreement as only Syncpointe, (Am. Agreement at 1)—to use no less than fifteen percent of any cash proceeds received by either Syncpointe or QuamTel from "any loan, convertible loan or any sale of equity or equity-related or equity-linked securities" to repay Plaintiff for the remaining balance of the Loan. (*Id.* ¶ 1.)

---

1. Because Syncpointe was only obligated to repay the Amount Outstanding in a single lump payment (unless there are terms the parties have not made the Court aware of), this "acceleration clause" would only kick in if the default is due to some reason other than failure to repay the Amount Outstanding by the due date. It makes no sense to "accelerate" the amount due when the entire amount is due in a single payment—presuming, of course, that the note evidencing the debt does not contain a payment schedule. Any such note is note part of the record, however.

Section 2 acknowledges that Quamtel provided Plaintiff with 25,000 shares of Quamtel's common stock in satisfaction of Syncpointe's obligations under the original Loan Agreement to (1) issue Plaintiff one percent of its equity interests pursuant to Section 7 of the Loan Agreement (because a "majority equity financing" had not occurred prior to September 15, 2010); and (2) pay the $25,000 "Event of Default" fee set forth in Section 5(d) of the Loan Agreement (*Id.* ¶ 2.)

Section 3 modified—but did not obviate—Syncpointe's obligation to place the Source Code in escrow. Instead of requiring Syncpointe to place the Source Code in escrow by a certain date, the Amended Agreement provided that "Upon Borrower [*i.e.,* Syncpointe] and/or QuamTel obtaining full possession and exclusive rights to the Source Code, Borrower must comply with the requirements of Section 6 of the [Loan Agreement] within fifteen (15) days thereafter." (*Id.* ¶ 3.)

Section 4 made clear that "Borrower" (Syncpointe) remained liable for the Amount Outstanding:

> Borrower shall use its best efforts to pay [Plaintiff] all amounts due and owing pursuant to the [Loan Agreement] on or before December 31, 2010. Notwithstanding the foregoing, Borrower agrees to pay the Principal Amount plus all accrued interest thereon [*i.e.,* the Amount Outstanding], and any and all expenses then due, on or before March 31, 2011.

(*Id.* ¶ 4.) Section 4 also extended the due date to repay the Amount Outstanding to March 31, 2011. (*Id.*)

Section 5 reduced the interest rate of the Loan to twelve percent "retroactive to the date of the initial Event of Default (July 3, 2010.)" (*Id.* ¶ 5.) It also provided that "Upon any breach by Borrower and/or QuamTel of this [Amended Agreement], the parties agree to an increase to the interest rate of the Loan to [eighteen percent] retroactive to the date of the initial Event of Default (July 3, 2010)." (*Id.*)

In Section 6 of the Amended Agreement, Quamtel agreed to put up its own collateral to secure the Loan, subject to a few conditions. Specifically, Quamtel agreed that the

> Secured Obligations defined in Section 4 of the [Loan Agreement] do hereby include all Collateral of QuamTel, in addition to Collateral of Borrower, *provided* that [Plaintiff's] security interest in the Collateral of QuamTel shall be subordinate to the existing (as of the date of this Agreement) secured senior debt of QuamTel.

(*Id.* ¶ 6 (emphasis in original).) Quamtel further agreed in Section 6 to "abide by the terms of the [Loan Agreement] *relating to such Collateral* as if QuamTel was a party to such agreement (including Sections 4 and 5 thereof, but not including Section 6 relating to escrow of Collateral)." (*Id.* (emphasis added).)

By agreeing to abide by the terms of the Loan Agreement relating to collateral, Quamtel pledged to secure the Loan and Syncpointe with the same types of collateral—receivables, inventory, equipment, cash and monetary investments—as Syncpointe did in the underlying Loan Agreement. Moreover, Quamtel granted Plaintiff the right to proceed against Quamtel's collateral without demand in the event of default. However, in Quamtel's case, Plaintiff's rights in the collateral were subordinated to any existing secured senior debt.

Section 6 of the Amended Agreement exempted Quamtel from any obligation imposed by Section 6 of the Loan Agreement to place the Source Code into escrow. (*Id.*) That obligation was imposed only on Syncpointe, as delineated in the original Loan Agreement. (Loan Agreement ¶ 6.)

Additionally, Section 6 of the Amended Agreement requires that Quamtel "pay all costs and expenses (including [Plaintiff's] reasonable attorney's fees and expenses) incurred by [Plaintiff] in connection with the preservation and enforcement of [Plaintiff's] rights under the Loan and Security Agreement, and under [the Amended Agreement], whether suit shall be brought or not." (Am. Agreement ¶ 6.)

Paragraph 10 of the Amended Agreement made clear that the Amended Agreement was only intended to modify certain provisions of the Loan Agreement: "Except as explicitly modified and amended herein, all of the terms and conditions of the Loan Agreement" remained in full force and effect. (*Id.* ¶ 10.)

At the time the parties signed the Amended Agreement, Plaintiff's security interest in Quamtel's collateral was subordinated to a $1,250,000 loan payable to Gilder Funding Corp. ("Gilder"), one of Quamtel's shareholders; Gilder's loan was secured by "a first priority lien and security interest in *all assets* of [Quamtel]" (the "Gilder Note"), (Efros. Ex. E ("2010 10-K") at F-21 (emphasis added).) The Court is not aware of any other secured senior debt that existed prior to the signing of the Amended Agreement, which does not mean that there is none.

### F. Subsequent Defaults Under the Amended Agreement

Even after negotiating and executing the Amended Agreement, no further payments were made on the Loan. As a result, the Loan again went into default on March 31, 2011. (Quamtel and Pl.'s 56.1 Statements ¶ 22.)

On April 1, 2011, Plaintiff again agreed to extend the maturity date, from March 31, 2011 to June 15, 2011, with all other terms of the Amended Agreement remaining in full force and effect. (*Id.* ¶ 23.) In consideration for this extension, Quamtel issued and delivered 10,000 shares of its stock to Plaintiff. (*Id.*)

The Loan was again not paid on the extended due date. The Loan, in default yet again, continues to accrue interest at eighteen percent. (*Id.* ¶ 25; Efros Aff. Ex. H ("June 30, 2011 10-Q") at 12 (showing that the Amount Outstanding was still unpaid as of June 30, 2011); *see also id.* ¶¶ 25-26.)

### G. The Syncpointe Asset Sale

On June 6, 2011, "Syncpointe sold substantially all of its assets … to Mobilelogik, Inc. …. for two cash payments totaling $175,000." (*Id.*) Pursuant to this agreement, Mobilelogik assumed Syncpointe's $115,000 liability to a software vendor; Quamtel issued 15,000 shares of Quamtel restricted common stock to the software vendor as partial consideration for this assumption. (June 30, 2011 10-Q at 13,) The closing of the asset sale was contingent on the debt settlement with the software vendor, and, as a condition to closing, Quamtel placed 200,000 shares of its stock in escrow, pending Mobilelogik's "taking full possession of Syncpointe software related assets held by [the software vendor]," (*Id.*) Mobilelogik agreed to pay Quamtel $25,000 for Quamtel's "future marketing and sales assistance relating to Syncpointe's business." (*Id.*) [2]

Plaintiff did not receive any of the proceeds from the sale. (Quamtel and Pl.'s 56.1 Statements ¶ 31.)

---

**2.** The Court located this information in a paragraph buried in Quamtel's 10-Q for the period ending June 30, 2011.

## H. Plaintiff's Demand Letter

On July 26, 2011—after Syncpointe sold its assets to Mobilelogik but failed to repay the Loan—Plaintiff sent a letter to Quamtel, demanding that Quamtel—not Syncpointe—repay the Amount Outstanding (the "Demand Letter"). (*Id.* ¶ 27.) In the Demand Letter, Plaintiff asserted that, as "the subsequent purchaser of Syncpointe, [Quamtel] became liable for the full amount due on the loan ...," (Efros Aff. Ex. G ("Demand Letter") at 1), and chronicled all the alleged breaches of the Loan Agreement and Amended Agreement (collectively, the "Agreements").

The Demand Letter also asserted that Quamtel might itself have breached the Amended Agreement by selling the Source Code to a third party. Plaintiff stated that it learned that "Quamtel may have gained title to the [Source Code] but failed to place it in escrow as required by Section 3 of the Amended Agreement" and then sold the Source Code without turning over fifteen percent of the proceeds as required by Section 1 of the Amended Agreement. (*Id.* at 3.)

Finally, the Demand Letter notes that, under the Amended Agreement, "Quamtel agreed that the Amount Outstanding would be secured by Quamtel's assets." (*Id.* (citing Am. Agreement ¶ 6)). However, Plaintiff did not demand that Quamtel turn over the collateral in the letter. Instead, the Demand Letter solely demanded repayment of the Amount Outstanding.

## I. Quamtel Settles the Gilder Note

On August 12, 2011, Quamtel entered into a settlement agreement with Gilder terminating Gilder's outstanding—and senior—security interest granted in connection with the Gilder Note. (June 30, 2011 10-Q at 14, 24.) In exchange for 6,500,000 restricted shares of Quamtel common stock, Gilder agreed to discharge Quamtel's obligations under the Gilder Note in full, and agreed to terminate the security interest granted by the Gilder Note upon the receipt of the shares. (*Id.*) The parties have not told the Court whether Quamtel issued the 6,500,000 shares to Gilder.

## J. The Claims Asserted

Plaintiff asserts three causes of action against Defendants.

Plaintiff's first cause of action sounds in breach of contract, and seeks repayment of the Amount Outstanding from both Defendants. (Compl. ¶¶ 48–55.)

Plaintiff's second cause of action, also for breach of contract, seeks repayment of the Amount Outstanding, on the theory that Defendants breached the Agreements when they failed to put the Source Code in escrow. (*Id.* ¶¶ 56–66.)

Plaintiff's third cause of action is for conversion. (*Id.* ¶¶ 67–76.) Specifically, Plaintiff alleges that Defendants obtained full possession and exclusive rights to the Source Code, but failed to place it in escrow and convey title after Defendants' default, and instead wrongfully sold it to Mobilelogik.

Plaintiff has not moved for summary judgment against Syncpointe on these—or any other—claims. I assume that means that Syncpointe has been rendered judgment proof by the transaction described above.

## II. Discussion

A party is entitled to summary judgment when there is no "genuine issue of material fact" and the undisputed facts warrant judgment for the moving party as a matter of law. Fed.R.Civ.P. 56(a); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). On a motion for summary judgment, the court must view the record in the light most favorable to the nonmoving party and draw all reasonable inferences in its favor. *Matsushita Elec. Indus. Co.*

*v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

Whether any disputed issue of fact exists is for the Court to determine. *Balderman v. U.S. Veterans Admin.,* 870 F.2d 57, 60 (2d Cir.1989). The moving party has the initial burden of demonstrating the absence of a disputed issue of material fact. *Celotex v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

Once the motion for summary judgment is properly made, the burden shifts to the non-moving party, which "must set forth specific facts showing that there is a genuine issue for trial." *Anderson,* 477 U.S. at 250, 106 S.Ct. 2505. Because the Court must determine "whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved ... in favor of either party," *id.,* the non-moving party, in order to defeat the motion, must produce "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party ... If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted," *id.* at 249, 106 S.Ct. 2505 (citations omitted). The nonmovant "may not rely on conclusory allegations or unsubstantiated speculation," *Scotto v. Almenas,* 143 F.3d 105, 114 (2d Cir.1998), but must support the existence of an alleged dispute with specific citation to the record materials. Fed. R.Civ.P. 56(c). In other words, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec.,* 475 U.S. at 586, 106 S.Ct. 1348 (citations omitted). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505.

When the Court faces cross-motions for summary judgment, "each party's motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration," *Morales v. Quintel Entm't, Inc.,* 249 F.3d 115, 121 (2d Cir. 2001) (internal citation omitted).

■ It is undisputed that New York law applies in this case. "Where the parties agree that New York law controls, this is sufficient to establish choice of law." *Jalili v. Xanboo, Inc.,* No. 11 Civ. 1200, 2011 WL 4336690, at *3 (S.D.N.Y. Sept. 15, 2011) (quoting *Fed. Ins. Co. v. Am. Home Assurance Co.,* 639 F.3d 557, 566 (2d Cir. 2011)) (finding New York law applied where the parties did not argue that anything other than New York state law should apply).

**A. The Cross–Motions Addressed to Plaintiff's First and Second Causes of Action for Breach of Contract**

In its motion, Quamtel argues that (1) it is not liable for the pre-existing debts of its wholly owned subsidiary, (2) the Amended Agreement does not make Quamtel liable to repay the loan, and (3) it did not assume the repayment obligation of the loan in any other manner. (Mot, for Summ. J. at 5–12.) Quamtel filed its motion for summary judgment first and, though it attempted to anticipate Plaintiff's arguments, it was not able to frame the issues clearly. Plaintiff cross-moves for summary judgment, contending that Quamtel is obligated to satisfy Syncpointe's outstanding debt to Plaintiff based on the plain language of the Amended Agreement and because it is liable for Syncpointe's obligations under what it calls the "de facto merger" doctrine. (Opp'n 12–21.)

■ Where "parties set down their agreement in a clear, complete document, their writing should as a rule be enforced according to its terms." *W.W.W. Assocs. v. Giancontieri,* 77 N.Y.2d 157, 162, 565

N.Y.S.2d 440, 566 N.E.2d 639 (N.Y.1990). Where the terms of an agreement are clear and unambiguous, courts do not look beyond the four corners of the agreement, and parol evidence of the parties' intentions is inadmissible. *R/S Assoc. v. N.Y. Job Dev. Auth.,* 98 N.Y.2d 29, 33, 744 N.Y.S.2d 358, 771 N.E.2d 240 (N.Y.2002). A contract is unambiguous if "on its face [it] is reasonably susceptible of only one meaning." *See Greenfield v. Philles Records, Inc.,* 98 N.Y.2d 562, 569–70, 750 N.Y.S.2d 565, 780 N.E.2d 166 (N.Y.2002). "The language of a contract is not made ambiguous simply because the parties urge different interpretations." *O.D.F. Optronics Ltd. v. Remington Arms Co., Inc.,* 08 Civ. 4746(DLC), 2008 WL 4410130, at *11 (S.D.N.Y. Sept. 26, 2008) (quoting *Seiden Assocs., Inc. v. ANC Holdings, Inc.,* 959 F.2d 425, 428 (2d Cir.1992)). Courts may "not by construction add or excise terms, nor distort the meaning of those used and thereby make a new contract for the parties under the guise of interpreting the writing." *Vt. Teddy Bear Co. v. 538 Madison Realty Co.,* 1 N.Y.3d 470, 475, 775 N.Y.S.2d 765, 807 N.E.2d 876 (N.Y.2004) (quoting *Reiss v. Fin. Performance Corp.,* 97 N.Y.2d 195, 199, 738 N.Y.S.2d 658, 764 N.E.2d 958 (N.Y.2001)).

■ The interpretation of an unambiguous contract is a question of law for the Court, and is appropriate for resolution on a motion for summary judgment. *Adirondack Transit Lines, Inc. v. United Transp. Union, Local 1582,* 305 F.3d 82, 85 (2d Cir.2002), On the other hand, summary judgment is improper where contract language is ambiguous. *Fantozzi v. Axsys Technologies, Inc.,* No. 07 Civ. 02667(LMM), 2008 WL 4866054, at *4 (S.D.N.Y. Nov. 6, 2008).

The parties seem to feel that the Agreements are unambiguous. (Opp'n at 13; Reply at 3.) Insofar as is necessary to decide these motions, I agree.

■ To establish a breach of contract under New York law, a plaintiff must show (1) the existence of an agreement, (2) adequate performance of the contract by the claimant, (3) breach of contract by the accused, and (4) damages. *Stadt v. Fox News Network LLC,* 719 F.Supp.2d 312, 318 (S.D.N.Y.2010). Where the plain language of a contract signed by multiple parties indicates that only one party has assumed an obligation, only that party will be held liable for a failure to perform. *See Tradewell Foods v. N.Y. Credit Men's Adjustment Bureau,* 179 F.2d 567, 569 (2d Cir.1950).

Here, the first two elements of the claim are undisputed (1) the existence of the Agreements, (Quamtel and Pl.'s 56.1 Statements ¶¶ 3, 7), and (2) that Plaintiff adequately performed under the Agreements, (*see* Opp'n 16–17). What needs to be decided is whether Quamtel breached the Agreements in the manner alleged by Plaintiff.

### 1. Plaintiff's First Cause of Action for Breach of Contract is Dismissed Without Prejudice

Plaintiff argues that Quamtel is liable for the Amount Outstanding based on the plain language of the Agreements, and also because Quamtel became liable for Syncpointe's obligations as a result of a "de facto merger," a theory of successor liability. I will address each in turn.

In its First Cause of Action for breach of contract, Plaintiff alleges that the Loan was in default, and that Defendants breached the Amended Agreement by refusing to comply with the terms in the Agreements. (Compl. ¶¶ 51–52.) With respect to Quamtel, Plaintiff argues that Quamtel breached the Agreements by failing to turn over its collateral in response to Plaintiff's request to do so in the Demand Letter. Plaintiff asserts that, because of this failure, Quamtel must pay the

entire Amount Outstanding. (*See* Opp'n at 18.)

Quamtel moves for summary judgment dismissing the First Cause of Action. It argues that nothing in the Amended Agreement makes it responsible for paying the entire Amount Outstanding—indeed, it notes that Syncpointe is the only party obligated to pay the full Amount Outstanding—and that it is no way assumed Syncpointe's obligation to repay the Loan, either pursuant to some provision of the Amended Agreement or otherwise.

Plaintiff cross-moves for summary judgment in its favor on the First Cause of Action, insisting that it is as plain as day—or as the terms of the Amended Agreement—that Quamtel is responsible for the entire Loan amount (which Plaintiff insists Quamtel "fully secured"), and that Quamtel's failure to turn over its collateral means that it must repay the Amount Outstanding now.

The first thing to note is that nowhere in the Demand Letter does Plaintiff ask Quamtel to turn over Quamtel's collateral. The letter demanded that Quamtel pay the entire Amount Outstanding. So the factual predicate for Plaintiff's argument that Quamtel breached the Agreements is demonstrably and indisputably wrong.

Furthermore, nothing in the Amended Agreement imposes on Quamtel any obligation to repay the Syncpointe loan, even if Syncpointe does not do so. The Amended Agreement does not define Quamtel as a Borrower, or directly impose full liability for the Amount Outstanding (or, indeed, for any repayment of the loan) onto Quamtel. Section 4 of the Amended Agreement only obligates "Borrower" to repay the loan, and the term "Borrower" as used in the Amended Agreement is limited to Syncpointe. If the parties had wanted to expand the definition of that term to include Syncpointe's parent company, and thereby render Quamtel liable under the

literal language of the Loan Agreement, they could have done so. They did not.

What Quamtel agreed to do, under the unambiguous terms of the Amended Agreement, was to post its assets as security for repayment of the loan—albeit on a subordinated basis to its own senior secured indebtedness—and to abide by the provisions of Sections 4 and 5 of the original Loan Agreement insofar as they related to collateral as though it were a party to that Agreement. Plaintiff is entitled to take and sell Quamtel's collateral, provided that it is not subordinated to Quamtel's secured senior debt. Plaintiff plainly has a claim against Quamtel's collateral. Even beyond the clear language in the Amended Agreement granting such a security interest, discussed above, Quamtel has admitted in its SEC filings that Plaintiff has such a right. (2010 10–K at F–21 ("[Quamtel] agreed that its Collateral . . . would be included with the Syncpointe Collateral as part of the security interest under [the Loan Agreement] . . ."); *see also* Efros Aff. Ex. F (Mar. 31, 2011 10–Q) at 12.) Quamtel is bound by that admission in this Court. Plaintiff would have a viable breach of contract claim if Quamtel interfered with Plaintiff's right to seize and sell Quamtel's collateral—although the fact that Plaintiff's rights in Quamtel's collateral are subordinate to the rights of any senior Quamtel creditors might mean that litigation will be required to determine whether Plaintiff can in fact exercise its rights and seize the collateral.

But the record contains no allegations or evidence tending to show that Quamtel has done any such thing. Plaintiff has not alleged that it ever made any effort to exercise its rights against Quamtel's Collateral, only to be rebuffed. Instead, Plaintiff demanded that Quamtel pay the entire Amount Outstanding—something Quamtel is not contractually obligated to do.

Only if Quamtel is liable for a deficiency judgment under Section 5 of the Loan Agreement does Plaintiff have a claim against Quamtel for anything other than Quamtel's collateral. However, there is no way to assess whether any deficiency exists until Quamtel's collateral is seized and/or sold (or declared subordinated to other senior indebtedness, and thus unavailable for use in repaying Syncpointe's debt). As a result, there is no ripe case or controversy concerning Quamtel's liability, if any, for any deficiency that might exist once Quamtel's collateral is seized and sold or otherwise used to satisfy Syncpointe's indebtedness. If recourse to Quamtel's collateral extinguishes the entire loan, there will be no need to decide whether the deficiency provision in Section 5 of the Loan Agreement is a provision "relating to such Collateral"—in which case Quamtel is bound by it—or is something other than a provision "relating to such Collateral"—in which case Quamtel is not so bound.

In the alternative, Plaintiff asserts that Quamtel is liable for Syncpointe's debt on the theory that its purchase of the equity (*i.e.*, membership interests) in Syncpointe constituted a "de facto merger." This argument fails as a matter of law.

■ Under New York law, the fact that one corporation acquires the business of another does not automatically render the acquiring corporation liable for the antecedent debts of the acquired corporation. In fact, there are three ways that Corporation A can acquire the business of Corporation B, and two of them do not ordinarily render the purchaser liable for the seller's debts:

(1) If the purchaser buys the seller's equity (capital stock), the purchaser be-

comes liable for the seller's debts only if the stringent conditions for piercing the corporate veil are met.

(2) If the purchaser buys the assets of the seller, the purchaser does not become liable for the seller's debts unless one of four common law exceptions are met.

(3) Only if the two corporations merge to become a single entity does the successor corporation become automatically liable for the debts of both predecessor corporations.

*Cargo Partner AG v. Albatrans, Inc.*, 352 F.3d 41, 44–45 (2d Cir.2003). De facto merger, the doctrine Plaintiff cites, is one of the four common law exceptions to the usual rule that the purchaser of a corporation's assets does not ordinarily become liable for the seller's debts. *Cargo Partner,* · 352 F.3d at 45; see also, *Trystate Mech., Inc. v. Tefco, LLC,* 29 Misc.3d 1208(A), 2010 WL 3960604, at *5 (Sup.Ct. N.Y.Co. Oct. 6, 2010).

■ Here, Quamtel did not purchase Syncpointe's assets; it purchased the acquired corporation's equity, in the form of all of its outstanding membership interests. So even if Plaintiff offered sufficient evidence to prove that there had been a de facto merger between the two corporations, its contention would have to be rejected, because the de facto merger doctrine is inapplicable in an equity purchase situation. *See Golub v. Kidder, Peabody & Co., Inc.,* No. 89–CIV–5903 CSH, 2000 WL 1024688, at *4 (S.D.N.Y. July 25, 2000) (citing *Fireman's Fund Ins. Cos. v. Meenan Oil Co.,* 755 F.Supp. 547, 553 (E.D.N.Y. 1991)).[3]

Were this Court to give Plaintiff the benefit of the doubt (which is not ordinari-

---

**3.** The "de facto merger doctrine has been described as a judge-made device for avoiding patent injustice that might befall a party sim-

ply because a merger has been called something else," 15A N.Y. Jur.2d Bus. Relationships § 1320. A de facto merger occurs when

ly done on a motion for summary judgment), I would conclude that Plaintiff actually meant to invoke the doctrine of piercing the corporate veil. However, Plaintiff has not even attempted to demonstrate that the "stringent conditions" for piercing the veil between Quamtel and Syncpointe have been met.

Therefore, Quamtel's motion for summary judgment dismissing the First Cause of Action, which, as pleaded, asserts a legally insufficient claim for breach of contract on the ground that Quamtel has failed to pay the entire Amount Outstanding, is GRANTED.

All of the foregoing demonstrates that the parties have not done a very good job of analyzing their respective positions. I am dismissing the First Cause of Action, but 1 am doing so without prejudice; if Plaintiff has a good faith basis for filing an amended pleading alleging that there is a legally sufficient reason to pierce the corporate veil between Quamtel and Syncpointe, I will permit it. And obviously, if there is ever a deficiency to be paid, Quamtel will not be precluded from asserting that it is not liable for any deficiency, because it did not assume any such obligation under the Amended Agreement.

## 2. Quamtel's Motion for Summary Judgment on Plaintiff's Second Cause of Action for Breach of Contract is GRANTED

In the Second Cause of Action, Plaintiff alleges that Quamtel breached the Amended Agreement by (1) failing to place the Source Code in escrow, instead allowing it to be sold to a third party, and (2) failing to deliver to Plaintiff fifteen percent of the proceeds of the sale of Syncpointe to Mobilelogik. I will address each theory separately.

Quamtel argues that it is entitled to summary judgment dismissing the claim insofar as it is predicated on the failure to deliver the Source Code, because only Syncpointe, not it, was obligated under the Amended Agreement to place the Source Code in escrow—indeed, Quamtel insists that it never obtained control over the Source Code.

Section 6 of the original Loan Agreement required the Borrower—Syncpointe—to place the Source Code in escrow in order to secure the Loan. Section 6 of the Amended Agreement specifically exempts Quamtel from being bound by this requirement:

> QuamTel agrees to abide by the terms of the [Loan Agreement] relating to such Collateral as if QuamTel was a party to such agreement (including Sections 4 and 5 thereof, *but not including Section 6 relating to the escrow of Collateral* ).

(Am. Agreement ¶ 6 (emphasis added).)

To reinforce the point, Section 3 of the Amended Agreement obligates only *Syncpointe* to place the Source Code in escrow;

> Until such time as the Borrower [*i.e.,* Syncpointe] and/or QuamTel secures full

---

"a transaction, although not in form a merger, is in substance a consolidation or merger of seller and purchaser." *Douglas v. Stamco,* 363 Fed.Appx. 100, 102 (2d Cir.2010) (quoting *New York v. Nat'l Serv. Indus.,* 460 F.3d 201, 209 (2d Cir.2006)). To determine whether there has been a de facto merger, courts must consider whether there was (1) "continuity of ownership," (2) "continuity of management, personnel, physical location, assets, and general business operation," (3)

"cessation of ordinary business and dissolution of the acquired corporation as soon as possible," and (4) "assumption by the purchaser of the liabilities ordinarily necessary for the uninterrupted continuation of the business of the acquired corporation." *Id.* Even if a de facto merger theory were applicable in an equity purchase situation, the Court could not grant either party judgment as a matter of law on the sparse, pre-discovery record before it.

possession and exclusive rights to [the Source Code], the Lender [*i.e.,* Plaintiff] agrees to temporarily waive the requirement of Borrower, under Section 6 of the [Loan Agreement], to place the Source Code in escrow. Upon Borrower and/or QuamTel obtaining full possession and exclusive rights to the Source Code, *Borrower* must comply with the requirements of Section 6 of the [Loan Agreement] within fifteen (15) days thereafter.

(*Id.* ¶ 3 (emphasis added).)

As the Source Code was Syncpointe's asset, not Quamtel's, these provisions make perfect sense. They also entitle Quamtel to summary judgment dismissing the Second Cause of Action, insofar as it is based on non-delivery of the Source Code. It is not necessary to consider whether, as a matter of fact, Quamtel ever had custody of the Source Code, whether by virtue of its purchase of all the membership interests (essentially, the stock) in Syncpointe or otherwise.

Plaintiff's alternative theory is even more far-fetched. It argues that Quamtel violated Section 1 of the Amended Agreement by failing to give Plaintiff fifteen percent of the proceeds of the sale of what is described as Syncpointe's "equity" to Mobilelogik. Section 1 states:

Within five (5) business days of receipt of any funds by Borrower [*i.e.,* Syncpointe] or QuamTel from *any loan, convertible loan or any sale of equity or equity-related or equity-linked securities,* Borrower shall use not less than Fifteen Percent (15%) of the cash proceeds thereof to repay Lender [*i.e.,* Plaintiff] the remaining balance of the Loan … pursuant to the [Loan Agreement].

(*Id.* ¶ 1 (emphasis added).) Plaintiff's alternative theory fails because the parties agree (and it is therefore established) that Syncpointe sold its *assets* to Mobilelogik—

not its equity. (Quamtel and Pl.'s 56.1 Statements ¶ 30 ("In the August 10–Q, Quamtel also disclosed that on June 6, 2011, 'Syncpointe sold substantially all of its *assets* … to Mobilelogik.'") (emphasis added).) An asset sale and an equity sale are two very different transactions with two entirely different consequences, and Section 1's requirements clearly do not apply to an asset sale. Furthermore, Syncpointe could not have sold its equity, because its equity was owned by Quamtel. Last, under Section 1, only Syncpointe—not Quamtel—is obligated to turn over the proceeds of any such equity—not asset—sale.

Section 1 of the Amended Agreement is a particularly poorly drafted contractual provision. On its face, it requires "Borrower" (Syncpointe) to make a payment to Plaintiff, even if a corporation other than Borrower (*i.e.,* Quamtel) receives funds from selling an equity interest in Syncpointe. This seems nonsensical, but the parties chose the words used; if Plaintiff drafted the contract (this is not clear on the current record), the doctrine of *contra proferentem* will require the Court to construe these at best ambiguous words against the drafter.

In any event, the Court notes that, even if Quamtel did have an obligation to turn over the Source Code to Plaintiff, that breach—which would technically be a "default" under the Amended Agreement—would not entitle Plaintiff to recover the Amount Outstanding from Quamtel, which is what it seeks. For the reasons explained above, Plaintiff's first remedy against Quamtel is to seek recourse against Quamtel's collateral. In the event that the collateral proves insufficient to pay off the Loan, Plaintiff could seek a deficiency judgment against Syncpointe, and perhaps against Quamtel—although Quamtel's liability for any deficiency pres-

ents a contract issue that remains to be decided.

For the reasons discussed above, Plaintiff's de facto merger argument with respect to this breach of contract cause of action also fails.

Therefore. Quamtel's motion for summary judgment on Plaintiff's Second Cause of Action is GRANTED.

### B. The Cross–Motions Directed to Plaintiff's Third Cause of Action for Conversion are Denied

■ Plaintiff argues in the alternative that Quamtel is liable for selling the Source Code to Mobilelogik under a conversion theory. (Opp'n at 23–24.) "In order to establish a cause of action to recover damages for conversion, 'the plaintiff must show [1] legal ownership or an immediate superior right of possession to a specific identifiable thing and ... [2] that the defendant exercised an unauthorized dominion over the thing in question ... to the exclusion of the plaintiff's rights.'" *Scott v. Fields*, 85 A.D.3d 756, 925 N.Y.S.2d 135, 137 (2011) (quoting *Matter of Channel Mar. Sales, Inc. v. City of New York*, 75 A.D.3d 600, 903 N.Y.S.2d 922, 923 (2010)).

Plaintiff adduces no evidence that Quamtel ever "exercised an authorized dominion over" the Source Code. Plaintiff again improperly conflates Quamtel and Syncpointe: Quamtel itself did not sell the Source Code, and Plaintiff did not adduce evidence that Quamtel was ever in possession of, or exercised unauthorized dominion over, the Source Code.

It is, however, too early in the case to dismiss this claim against Quamtel. Plaintiff may discover facts that establish that Plaintiff had a right in the Source Code superior to that of Quamtel, and that Quamtel exercised unauthorized dominion over the Source Code. Based on the evidence before the Court, Syncpointe is Quamtel's wholly-owned subsidiary. While the Court respects the corporate form, I was not born yesterday; it is a rare subsidiary that sells off its assets to a third party without the active participation and consent of its parent. Contrary to Quamtel's contentions, this would not be duplicative of Plaintiff's breach of contract claim. *See Strategic Growth Int'l Inc. v. RemoteMDx Inc.*, 2008 WL 4179235 at *3 (S.D.N.Y.2008) (quoting *Briarpatch Ltd. v. Geisler Roberdeau, Inc.*, 148 F.Supp.2d 321, 328 (S.D.N.Y.2001)) (a conversion claim is duplicative unless it "result[s] in some 'wrong' that is separately actionable").

Therefore, the cross-motions addressed to this claim are DENIED, without prejudice to renewal at the close of discovery.

### C. Plaintiff's Motion for Attorneys' Fees is Denied

Finally, Plaintiff moves for its attorneys' fees pursuant to the Agreements. Quamtel offers no argument in opposition.

It is premature at this early stage in the litigation to award attorneys' fees. I will entertain such a motion when this litigation is finished.

### CONCLUSION

For the reasons discussed above, Quamtel's motion for summary judgment is dismissing Plaintiff's first cause of action for breach of contract is GRANTED without prejudice. Quamtel's motion for summary judgment for Plaintiff's second cause of action for breach of contract is GRANTED. The parties' cross-motions for summary judgment for Plaintiff's third cause of action for conversion are DENIED without prejudice. Plaintiff's motion for summary judgment for its attorneys' fees is DENIED without prejudice.

The Clerk of the Court is directed to remove the motions at Docket Nos. 11 and 19 from the Court's list of outstanding motions.